1    KEVIN V. RYAN (CSBN 118321)
     United States Attorney

2
     ROSS W. NADEL (CSBN 87940)
3    Chief, Criminal Division

4    MARTHA BOERSCH (CSBN 126569)
     JONATHAN R. HOWDEN (CSBN 97022)
5    PETER AXELROD (CSBN 190843)
     Assistant United States Attorneys

6
     HALLIE A. MITCHELL (CSBN 210020)
7    Trial Attorney, U.S. Department of Justice

8    450 Golden Gate Avenue, Box 36055
     San Francisco, California 94102
9    Telephone: (415) 436-7200

10   Attorneys for Plaintiff

11
                      UNITED STATES DISTRICT COURT

12
                    NORTHERN DISTRICT OF CALIFORNIA

13
                         SAN FRANCISCO DIVISION

14

15
     UNITED STATES OF AMERICA,        )    No. CR 00-0284 MJJ
16                                     )
              Plaintiff,               )    SUPPLEMENTAL MOTION IN LIMINE
17                                     )    TO ADMIT STATEMENTS OF YULIA
         v.                            )    TYMOSHENKO AS CO-CONSPIRATOR
18                                     )    STATEMENTS
     PAVEL LAZARENKO,                  )
19                                     )
              Defendant.               )
20   _____ )

21        The United States hereby supplements its motion in limine to admit statements made by

22   Yulia Tymoshenko, an un-indicted co-conspirator, during the course of and in the furtherance of

23   the conspiracy and the scheme to defraud.

24   //

25   //

26   //

27   //

28   //

     //

1

## ARGUMENT

2

I. THE STATEMENTS OF YULIA TYMOSHENKO, A NON-TESTIFYING CO-
CONSPIRATOR, ARE ADMISSIBLE IN EVIDENCE UNDER FED. R. EVID. 801(d)(2)

3

4

A. Legal Authority

5

Under Fed. R. Evid. 801(d)(2)(E), "a statement by a coconspirator of a party during the

6

course of and in furtherance of the conspiracy" is not hearsay. United States v. Crespo de Llano,

838 F. 2d 1006, 1017 (9th Cir. 1987). To admit statements of a coconspirator against a

7

defendant, the government need only establish by a preponderance of the evidence that (1) the

8

declarant and the defendant were members of a conspiracy; and (2) the statements were made

9

during and in furtherance of the conspiracy. Bourjaily v. United States, 483 U.S. 171, 175

10

(1987). Under Fed. R. Evid. 104(a), a court is not "'bound by the rules of evidence' in

11

determining the existence of preliminary facts to support the admission of evidence." Id. at 178.

12

Under Bourjaily, the requirements of Rule 801(d)(2)(E) and the Confrontation Clause of the

13

Sixth Amendment are identical. Id. at 182-84.

14

The test for admission of a co-conspirator's statements is "whether there is sufficient,

15

substantial evidence apart from [the statements] to establish a prima facie case of conspiracy and

16

the defendant's slight connection therewith." United States v. Zemek, 634 F.2d 1159, 1170 (9th

17

Cir. 1980). Circumstantial evidence can supply the necessary quantum of proof. United States v.

18

Weiner, 578 F.2d 757, 770 (9th Cir. 1978). The requisite evidence need not be uncontroverted.

19

United States v. Dixon, 562 F.2d 1138, 1141 (9th Cir. 1977). Finally, the court can consider

20

reasonable inferences that may be drawn from the evidence, and all the circumstances must be

21

viewed "collectively, not in isolation." Id. at 1142. Once a conspiracy is shown, the prosecution

22

need only present slight evidence connecting the defendant to the conspiracy. United States v.

23

Mason, 658 F. 2d 1263, 1269 (9th Cir. 1981).

24

A conspiracy need not be charged in order to allow the introduction of a co-conspirator's

25

statement under the rule. United States v. Portac, Inc., 869 F. 2d 1288, 1294 (9th Cir. 1989).

26

Furthermore, "the conspiracy that forms the basis for admitting coconspirators' statements need

27

not be the same conspiracy for which the defendant is indicted." United States v. Arce, 997 F.2d

28

UNITED STATES MOTION IN LIMINE
TO ADMIT COCONSPIRATOR STATEMENTS
[CR 00-0284-MJJ]                                          2

1   1123, 1128 (5th Cir. 1993). Participation as an aider and abettor is sufficient, as a concert of

2   action creates a conspiracy for purposes of the evidentiary rule. Id. See also, United States v.

3   LeFever, 798 F. 2d 977, 983 (7th Cir. 1986); United States v. Reynolds, 919 F. 2d 435, 439 (7th

4   Cir. 1990); and United States v. Blankenship, 954 F. 2d 1224, 1231 (6th Cir. 1992). Moreover,

5   evidence against one defendant in a conspiracy can properly be considered against another

6   defendant given evidence linking each to the conspiracy. United States v. Nixon, 918 F. 2d

7   895, 906 (11th Cir. 1990).

8       A trial court has discretion to vary the order of proof in admitting a co-conspirator's

9   statement; the statement may be admitted prior to the presentation of independent evidence of the

10  conspiracy. United States v. Loya, 807 F. 2d 1483, 1490 (9th Cir. 1987); United States v.

11  Arbelaez, 719 F. 2d, 1453, 1460 (9th Cir. 1983).

12      B.  The Charged Conspiracy and the Scheme to Defraud

13      Count One of the Second Superseding Indictment alleges a conspiracy to launder money

14  among the defendant, Peter Kiritchenko, and others between January 1992 and June 1999. The

15  indictment generally alleges that the defendant and others conspired to launder the proceeds of

16  extortion and fraud through various bank accounts, including accounts in the United States. The

17  indictment alleges that as part of the conspiracy Lazarenko, as a government official in Ukraine,

18  would engage in various acts of extortion and fraud, and would receive funds that had been

19  stolen, converted and taken by fraud, and would transfer the proceeds of this activity into bank

20  accounts in Switzerland, Antigua, Poland, the United States, and elsewhere, and that he induced

21  Kiritchenko to assist Lazarenko to open bank accounts in Switzerland, Antigua, Poland, and the

22  United States, and to transfer the proceeds of fraud and extortion into and out of these bank

23  accounts in an effort to conceal and disguise the nature, location, source, ownership, and control

24  of the proceeds of the specified unlawful activity. The conspiracy count incorporates the wire

25  fraud scheme to defraud, which more specifically alleges that the defendant received money and

26  property from individuals and businesses on behalf of whom he was exercising his official

27  authority.

28

UNITED STATES MOTION IN LIMINE
TO ADMIT COCONSPIRATOR STATEMENTS
[CR 00-0284-MJJ]                                    3

1        In particular, with respect to Ms. Tymoshenko, the indictment alleges that in
2   approximately September 1995, Lazarenko, as First Vice Prime Minister of Ukraine, became
3   responsible for the energy section in the Ukrainian government, and that in approximately
4   December 1995, a Ukrainian company called United Energy Systems of Ukraine ("UESU"),
5   which was created on November 20, 1995 by Yulia Tymoshenko, an associate of Lazarenko's,
6   was designated by the Ukrainian government as one of several companies to supply natural gas to
7   Ukraine. UESU was given the authority to distribute natural gas to the Dnepropetrovsk region of
8   Ukraine. From approximately December 1995 until sometime in 1997, UESU received
9   deliveries of natural gas from RAO Gazprom pursuant to contracts entered on December 29,
10  1995 and December 31, 1996 between RAO Gazprom, UESU, and others. Beginning in
11  approximately January 1996, UESU fraudulently conveyed title to the imported natural gas to
12  United Energy International, Ltd. ("UEIL"), an 85% shareholder of UESU that was created on
13  October 17, 1995, in London, England by a Turkish national named Ercument Aksoy, at the
14  direction of Yulia Tymoshenko, and fraudulently diverted to foreign bank accounts belonging to
15  UEIL the payments from Ukrainian customers for the natural gas delivered by UESU.

16       The indictment further alleges that between April 8, 1996 and December 31, 1996, rather
17  than pay RAO Gazprom for the delivered gas with the money that had been transferred to UEIL,
18  UEIL transferred approximately $140,000,000 to Somolli Enterprises, a Cypriot company that
19  was registered in Cyprus on October 8, 1992, and was controlled by Yulia Tymoshenko and
20  others. Between April 1996 and June 1997, Somolli Enterprises and UESU transferred a total of
21  approximately $97,000,000 into accounts that were controlled by Kiritchenko in Switzerland,
22  Poland, and the United States, including transfers totaling approximately $13,000,000 to bank
23  accounts in the Northern District of California. Between February of 1996 and September of
24  1997, the money from Somolli, along with other funds, totaling more than $120,000,000 was
25  transferred from Kiritchenko's accounts into accounts controlled by Lazarenko in Switzerland
26  and Antigua. Thereafter, the indictment alleges, Lazarenko transferred portions of these funds
27  from Switzerland into bank accounts in the Northern District of California, including two

28

UNITED STATES MOTION IN LIMINE
TO ADMIT COCONSPIRATOR STATEMENTS
[CR 00-0284-MJJ]                                    4

1    transfers of $14,000,000 each on August 1, 1997.

2        Finally, part of the conspiracy includes the scheme to defraud alleged in Paragraphs 32 to

3    38 of the indictment. As part of the scheme to defraud, the defendant, while a government

4    official in Ukraine, exercised his official authority and influence in favor of, and to induce the

5    grant of certain government benefits and privileges to Yulia Tymoshenko's businesses, among

6    others, by taking certain official action, and between 1993 and 1997 he received over

7    $200,000,000 from various companies, including Yulia Tymoshenko's businesses Somolli

8    Enterprises ($84,000,000) and UESU ($13,000,000). The indictment alleges that the defendant

9    took official action with respect to "Cube," a company owned and controlled by Yulia

10   Tymoshenko, and that when he was the First Vice Prime Minister in charge of the energy sector,

11   he exercised his official authority to advance the business interests of UESU so that UESU

12   obtained the right to sell and distribute natural gas to certain commercial and state enterprises in

13   the Dnepropetrovsk region of Ukraine. The indictment alleges that as a result of these actions,

14   the people and government of Ukraine were deprived of money and of the defendant's right to

15   honest services.

16       C. The Evidence of the Conspiracy

17       The evidence discussed below demonstrates that Tymoshenko was a co-conspirator in the

18   scheme to defraud and the conspiracy to launder the proceeds of the wire fraud and the UESU

19   fraud. The evidence, and the reasonable inferences that can be drawn from the evidence,

20   demonstrates that Lazarenko agreed with Tymoshenko to use his official position for the benefit

21   of UESU in exchange for a portion of the profits of Tymoshenko's businesses. The evidence,

22   and the reasonable inferences that can be drawn from the evidence, shows that Tymoshenko

23   conspired with Kirichenko and Lazarenko to hide the payments to Lazarenko using a number of

24   offshore companies controlled by Tymoshenko, including UEIL and Somolli Enterprises, and a

25   series of Swiss and other bank accounts controlled by Kirichenko and Lazarenko, including the

26   ORPHIN, WILNORTH, CARPO-53 and NIHPRO accounts, to transfer money from UESU's

27   gas business to Lazarenko. The evidence is summarized below.

28

### 1.   Peter Kirichenko and the Bank Records

In statements provided to the defense over a year ago,[1] Peter Kirichenko describes Tymoshenko's role in the acts charged in the indictment. Lazarenko and others told Kirichenko that when he was the Governor of Dnepropetrovsk, Lazarenko was receiving 50% of various business doing business in the region, including 50% of the profits of a company called Cube owned by Yulia Tymoshenko. FBI 302 (December 21, 1999). Lazarenko told Kirichenko that when he was governor he would control the business that could be conducted with Ukrainian State Enterprises by business controlled by himself, Tymoshenko, Dityatkovsky, and others. Kirichenko Protocol at 22. Beginning in 1993, on Lazarenko's instructions, Kirichenko transferred 50% of his own profits to two of Lazarenko's Swiss bank accounts: an account under the name of LIP Handel, and an account in the name of KATO-82.

In 1994, Lazarenko told Kirichenko that there was a problem with Lazarenko's LIP Handel account, which was the account to which Kirichenko had been sending money to Lazarenko, and that he wanted to open a new account at a bank in Geneva where Kirichenko already had an account. FBI 302 (December 21, 1999). In addition, at this time, the bank at which Lazarenko had his KATO-82 account indicated that it no longer wished to have Lazarenko's account because he was a public official. Id. Thereafter, Lazarenko directed Kirtichenko to open and manage bank accounts that were receiving money from several businesses that were paying Lazarenko. FBI 302 (May 17, 2000). Kirirchenko agreed, fearing that if he did not, he would have to cease all economic activity. Kirichenko Swiss Protocol (February 15, 2000). Kirichenko helped Lazarenko open his CARPO-53 and NIHPRO accounts, but Lazarenko wanted the money he was receiving from others, including Tymoshenko, to pass through Kirichenko's accounts, in order to prevent anyone from knowing which were

---

[1] The government has produced a lengthy protocol taken by Ukrainian authorities pursuant to a Mutual Legal Assistance request ("Kirichenko Protocol"); two protocols taken by the Swiss Examining Magistrate in connection with the extradition proceedings against Kirichenko and Lazarenko ("Kirichenko Swiss Protocol"); and a number of FBI 302s ("FBI 302").

UNITED STATES MOTION IN LIMINE
TO ADMIT COCONSPIRATOR STATEMENTS
[CR 00-0284-MJJ]                                    6

1   Lazarenko's personal accounts. Kirichenko Swiss Protocol (February 15, 2000).

2           Lazarenko and Kirtichenko thereafter met frequently, sometimes monthly, and during
3   those meetings would discuss the money that was coming into Kirichenko's accounts and the
4   payments Lazarenko expected to receive. Sometimes Lazarenko called the people from whom he
5   expected money, including Tymoshenko and her partner Oleksandr Gravets, and instruct them to
6   send the money. FBI 302 (May 17, 2000). In addition, Lazarenko would provide Kirichenko
7   with written instructions regarding these funds, and Kirichenko would then contact the banks and
8   direct them according to Lazarenko's wishes. Kirichenko Swiss Protocol (February 15, 2000).
9   Lazarenko received money from Tymoshenko through Kirichenko's ORPHIN accounts at
10  American Bank in Poland and Credit Suisse as well as through an account in the name of
11  Wilnorth[2] at Banque SCS Alliance. Id. Tymoshenko transferred money to these accounts for the
12  benefit of Lazarenko, and neither Kirichenko himself nor any of his companies did business with
13  Yulia Tymoshenko or any of her companies. Kirichenko was present on several occasions when
14  Lazarenko called Tymoshenko and insisted that she send money to him from the profits of her
15  business enterprises. FBI 302 (May 17, 2000). Kirichenko understood from Lazarenko, these
16  phone calls, and from his review of his bank records that the money from Somolli Enterprises
17  was from Tymoshenko. Kirichenko Protocol at 22.

18          On several occasions Kirichenko was present during meetings between Lazarenko,
19  Tymoshenko, and Serif Ercument Aksoy, the nominal director of United Energy International,
20  Ltd. ("UEIL"), a London company created by Tymoshenko and Aksoy. On one occasion, at the
21  end of 1995 or the beginning of 1996, he was present on a private airplane with Aksoy,
22  Tymoshenko, and Lazarenko. FBI 302 (October 18, 2000). In 1998, Kirichenko met in London
23  with Aksoy, Tymoshenko, and Lazarenko. According to Lazarenko, Tymoshenko believed she
24  had overpaid Lazarenko (more than his 50% share of her profits) and she wanted some money to
25  be returned to her. Id. Bank records for the UEIL account at National Westminster Bank in
26  London, England show transfers from UEIL to Somolli Enterprises between April 1996 through

27

28          [2] Wilnorth was a company owned by Kirichenko and Lazarenko.

1 | December 1997 of approximately $197,495,465.

2 | The bank records corroborate Kirichenko's statements. Specifically, admitted records
3 from this same time period demonstrate that between July 1996 and September 1996, the
4 Wilnorth account received approximately $14,099,636 from Tymoshenko's company Somolli
5 Enterprises.[3] Bank records show that between April 1996 and August 1996, Kirichenko's
6 ORPHIN account at American Bank in Poland received approximately $49,929,347 from
7 Somolli Enterprises, and his ORPHIN account at Credit Suisse received approximately
8 $23,049,386 from Somolli Enterprises between April 1996, and December 1996. Finally, bank
9 records demonstrate that in May and June of 1997, Kirichenko's ORPHIN account at European
10 Federal Credit Bank ("Eurofed") received approximately $13,999,970 from Somolli Enterprises.
11 Neither Kirichenko nor his companies did any business with Somolli Enterprises, and all of these
12 funds from Somolli Enterprises and UESU were subsequently transferred to Lazarenko's
13 accounts, and bank records confirm transfers from these accounts to Lazarenko's NIHPRO and
14 CARPO-53 accounts in Switzerland and to his personal account at Eurofed. These transfers,
15 totaling approximately $101,078,339, are approximately 51% of the total amount that UEIL paid
16 to Somolli Enterprises.

17 | As Kirichenko became more involved in managing Lazarenko's accounts, Lazarenko told
18 him that Lazarenko made a $7,000,000 payment to Evghen Marchuk, then the Prime Minister, so
19 that he would allow Tymoshenko to get involved in the natural gas business. FBI 302 (May 17,
20 2000). Kirichenko has stated that part of the assistance Lazarenko provided to Tymoshenko was
21 enabling her to become the creditor with respect to various industrial plants in Ukraine, in
22 exchange for the provision of natural gas, and that he observed Lazarenko meeting with the
23 directors of these enterprises. Id. Lazarenko instructed Kirichenko to transfer money from
24 Kirichenko's and Lazarenko's jointly-controlled Bainfield account at Banque SCS Alliance to a

25

26

27 | [3] The testimony of Andreas Petrou, Doncho Stoyanovsky, Serif Ercument Aksoy, and
Oleksandr Reshetka, as well as the documents admitted from Cyprus (Gov. Ex. 1805, 1816),
28 demonstrate that Tymoshenko controlled Somolli Enterprises.

UNITED STATES MOTION IN LIMINE
TO ADMIT COCONSPIRATOR STATEMENTS
[CR 00-0284-MJJ]         8

1 company called Eagle Enterprises and a company called Lucky Star Enterprises, and that these

2 transfers were for the benefit of Rem Viakhirev, who, as evidenced by the testimony of Anatoly

3 Minchenko and Evgeny Dovzhok, was the head of RAO Gazprom at the time. Bank records for

4 Bainfield's account at Banque SCS Alliance show two transfers on June 4, 1996, one of

5 $1,280,032 to Eagle Enterprises, and one of $1,400,032 to Lucky Star Enterprises.

6     2.    Serif Ercument Aksoy

7     Serif Ercument Aksoy was the nominal director of UEIL. He testified that he first met

8 Yulia and Alexander Tymoshenko and Oleksandr Gravets when they had a company called Cube

9 in Dnepropetrovsk, and that they also controlled United Energy International, Ltd., through an

10 offshore trust, BL Trust. Aksoy 13-19. Aksoy testified that UEIL acted on instructions from

11 Somolli Enterprises, particularly for receiving and transferring money, and that Somolli was

12 controlled by Gravets and Yulia and Alexander Tymoshenko. Aksoy 27-28. Aksoy testified that

13 he was familiar with the contract between RAO Gazprom and UESU for the year 1996, and that

14 Lazarenko, who was the First Vice Prime Minister of Ukraine at the time, negotiated the basic

15 terms of the contract with RAO Gazprom, id. at 46, and that he (Aksoy) attended a meeting

16 between Rem Viakhirev, the head of RAO Gazprom and Lazarenko.

17     After the contract was signed, the gas was distributed in Ukraine by UESU, id. at 56, but

18 UEIL received the money for the gas. Once UEIL received the money for the gas from UESU,

19 UEIL would transfer the money as directed by Somolli Enterprises. Id. at 67-72. See also Gov.

20 Exhibit 872 (Aksoy diagram). Aksoy testified that he never ordered the transfer of any money

21 from UEIL to Moscow, to RAO Gazprom, during 1996. Id. at 82, 83. Instead, at the end of

22 1996, UEIL, UESU, RAO Gazprom, the Russian Ministry of Defense, and the Russian Ministry

23 of Finance entered a complicated agreement pursuant to which UESU agreed to supply goods to

24 the Russian Ministry of Defense to extinguish its debt to RAO Gazprom.[4]

25     Aksoy testified that he met Lazarenko when Lazarenko was First Vice Prime Minister

26 and Yulia Tymoshenko invited Aksoy to Lazarenko's office. Aksoy at 97-98. Aksoy met

27

28     [4] This agreement is the subject of the testimony of Andrei Vavilov, discussed below.

UNITED STATES MOTION IN LIMINE
TO ADMIT COCONSPIRATOR STATEMENTS
[CR 00-0284-MJJ]         9

1    Lazarenko again in Canada on an official delegation that included the Tymoshenkos and Gravets.

2    Id. He also testified that he was present at a meeting in London at the Savoy Hotel sometime in

3    1997 or 1998 between Yulia Tymoshenko, Alexander Tymoshenko, and another person whom

4    Aksoy could not recall. Id. at 227-228. Aksoy denied any knowledge of payments by Somolli to

5    Lazarenko. He also confirmed that Lazarenko had no business or contractual relationship with

6    Somolli, UESU or UEIL. Aksoy 101-102.

7           3.     Oleksandr Gravets

8           Oleksander Gravets was Tymoshenko's partner in Cube beginning in 1992, and Cube

9    engaged in trade in the Dnepropetrovsk region. According to Gravets, in 1996 or 1997, Cube

10   changed its name to United Energy Systems of Ukraine ("UESU"). Gravets also testified he,

11   Yulia Tymoshenko, and Alexander Tymoshenko owned Somolli Enterprises, which they set up

12   in Cyprus in 1992 or 1993, and that Somolli Enterprises owned Cube and, after the name change,

13   owned UESU. Gravets 41:2-8. Gravets further testified that he and the two Tymoshenkos ran

14   UESU. Gravets 41:20-22. Documents show that UESU was not even created as a legal entity

15   until 1995, just one month before it was officially designated as a distributor of natural gas in

16   Ukraine. With respect to Somolli Enterprises, Gravets testified that he was signatory on the

17   Somolli Enterprises account at the Bank of Cyprus, Gravets 51:17, but that he believed that

18   Andreas Petrou or Mr. Papapetrou ran Somolli Enterprises. Gravets 52:21 –22.

19          Gravets testified that he, Yulia Tymoshenko, Alexander Tymoshenko, and Serif Aksoy

20   were present together in London, England when United Energy International, Ltd. ("UEIL") was

21   created, Gravets 62:8 – 63:24, and that UEIL was owned by a company controlled by Aksoy and

22   an entity controlled by Gravets and the Tymoshenkos. Gravets testified that UEIL and UESU

23   were both engaged in the distribution of natural gas in Ukraine and that Aksoy and Yulia

24   Tymoshenko frequently traveled to Moscow in connection with this business during 1996 and

25   1997. Gravets testified that UEIL worked with UESU, and Somolli Enterprises. Gravets 60:9 –

26   62:8.

27          Gravets testified that after he left Ukraine, he met with Yulia Tymoshenko in Israel and

28

UNITED STATES MOTION IN LIMINE
TO ADMIT COCONSPIRATOR STATEMENTS
[CR 00-0284-MJJ]                            10

1  asked her about reports in the newspapers that Somolli Enterprises made payments to Lazarenko,
2  payments about which Gravets testified he had no prior knowledge. Gravets 91. Gravets had
3  previously indicated that he told Tymoshenko: "if you have that much free money, then why
4  don't you hand some – fork some over? We had been partners. If this is a gain, then I should
5  have my part." Tymoshenko told Gravets that the money to Lazarenko regarded "purchasing
6  transactions." Gravets 91:24.[5] Gravets added that he had never had any financial dealings with
7  Lazarenko. Gravets 79:20-23.

8          3.      Andreas Petrou

9          Andreas Petrou was a nominal director of Somolli Enterprises, and it was through Petrou
10  that Tymoshenko, Gravets, and Oleksandr Tymoshenko set up Somolli Enterprises in Cyprus.
11  Petrou testified that in 1992, Tymoshenko and two other men came to see him in Nicosia,
12  Cyprus, looking for a lawyer to help them set up a company. Petrou directed them to a lawyer
13  and then Petrou subsequently became a "temporary" director of Somolli. He testified, however,
14  that he played no role in the actual operation of the business and signed only one or two
15  documents related to Somolli. In particular, he testified that he did not sign the agency
16  agreement between Somolli and UEIL, pursuant to which UEIL paid Somolli the money
17  discussed above.

18          Records from Cyprus show that the owners of Somolli Enterprises were Yulia
19  Tymoshenko, Alexander Tymoshenko, and Oleksandr Gravets, and bank records from Cyprus
20  demonstrate that they controlled Somolli's Bank of Cyprus account.[6]

21          4.      Doncho Stoyanovsky

22          Doncho Stoyanovsky was supposedly the director of Somolli Enterprises. Stoyanovsky
23  said Somolli Enterprises was created after he received a call from Alexander Tymoshenko, who

24  ―――――――――――――――――――――――――――――――――――――――――――
25          [5] Kirichenko states that his companies ORPHIN and Wilnorth, which initially received
        the money from Somolli Enterprises, never did any business with Somolli.
26
27          [6] Although Andreas Petrou is listed on Gov. Ex. 1805 as a director of the company, he
        testified that he had no control nor knowledge of any of the financial activity of Somolli
28      Enterprises.

UNITED STATES MOTION IN LIMINE
TO ADMIT COCONSPIRATOR STATEMENTS
[CR 00-0284-MJJ]                                    11

asked him if he would agree to form an offshore company. Stoyanovsky agreed, but from that time until 1997, he had little contact with Tymoshenko. Stoyanovsky has stated that he had nothing to do with the business of Somolli Enterprises between 1992, when it was formed, and 1997. He did not participate in its founding, he signed no documents when it was founded, he received no income or compensation from Somolli Enterprises during this time, and he had no knowledge of the business that Somolli Enterprises conducted during this period. He stated that he would occasionally receive and sign documents relating to Somolli Enterprises, but he had no knowledge of the underlying transactions. In particular, with respect to a number of wire transfer orders that were sent to UEIL from Somolli (these are part of Gov. Ex. 709, the bank records from National Westminster Bank), he stated that he first saw these documents in 1998 at a meeting in London with Alexander Tymoshenko, Aksoy, and others, and that he signed some of them in blank and some of the as completed forms. He had no control, however, over any of the Somolli bank accounts or any of the funds of Somolli.

5.     Yulia Tymoshenko/Alexander Tymoshenko

Both of these witnesses were summons to appear for their depositions in Ukraine. Yulia Tymoshenko appeared and refused to testify. Alexander Tymoshenko never appeared.

6.     Statements of Andrei Vavilov

Andrei Vavilov was the Russian Deputy Minister of Finance in 1996 and he was a signatory on a contract between the Russian Ministry of Finance, the Russian Ministry of Defense, RAO Gazprom, UESU, and UEIL, pursuant to which UESU agreed to deliver goods to the Russian Ministry of Defense to extinguish its debt to RAO Gazprom for prior deliveries of gas to Ukraine. This is the same agreement discussed by Aksoy, above. Vavilov met with Tymoshenko in Moscow, and during that meeting she explained the debt to Vavilov and the reasons why they wanted to execute the agreement.

6.     Kleshnya and Shostak

Anatoliy Kleshnya and Anatoly Shostak worked at the State Committee for Material Resources of Ukraine. Each testified that the defendant instructed them to enter a contract with

UNITED STATES MOTION IN LIMINE
TO ADMIT COCONSPIRATOR STATEMENTS
[CR 00-0284-MJJ]                                      12

1    UESU for UESU to sell material goods to the government of Ukraine for its reserves. Each will
2    testify about conversations they had with Yulia Tymoshenko regarding the pricing of the goods
3    and the attempts to negotiate a contract. Ultimately no contract was entered because they
4    believed that UESU was overcharging the government for the goods.[7]

5    Specifically, Shostak testified that in early 1996, when he was head of the Committee,
6    then Prime Minister Lazarenko approached him at an out-of-town Cabinet of Ministers meeting
7    and told Shostak to return to his office to meet with Yulia Tymoshenko. Shostak 35-36. At that
8    time, Shostak did not know Yulia Tymoshenko and had no relations with her company, UESU.
9    At that meeting, Tymoshenko proposed to Shostak to purchase from and sell to the Committee
10   reserves. Thereafter, Shostak met with Tymoshenko 3-5 times. Shostak rejected the prices
11   proposed by UESU as too high and advised Lazarenko accordingly. Lazarenko nonetheless told
12   him to approve the prices, and Lazarenko summonsed Shostak to his office on several occasions.
13   Shostak 54:7-14, 58:21-59:19.

14   Kleshnya testified that shortly after he took over as head of the Committee (from
15   Shostak), Lazarenko (who was Prime Minister at the time) urged him to enter into a contract with
16   UESU. Kleshnya 21:10-16. Kleshnya informed Lazarenko that the prices proposed by UESU
17   were not acceptable. Id. at 29:16-19. Lazarenko told him to "do everything possible" to enter
18   into an agreement, and Lazarenko instructed him to meet with Yulia Tymoshenko. Id. at 31:6,

19

20   ⁷ The government is filing a separate motion to admit this evidence as evidence that is
     "inextricably intertwined" with the charged conspiracy, or, alternatively, that the evidence is
21   admissible "other acts" showing the defendant's plan, scheme and intent under Fed. R. Evid.
     404(b). The Ninth Circuit has held that "other act" evidence is inextricably intertwined" with a
22   charged conspiracy if it 1) constitutes a part of the transaction that serves as a basis for the
     criminal charge, which includes evidence that may be relevant to the conspiracy to show the
23   background and development of the conspiracy, or 2) it was necessary to permit the prosecutor to
24   offer a coherent and comprehensible story regarding the commission of the crime. United States
     v. Serang, 156 F.3d 910, 915 (9th Cir 1998). Furthermore, "[t]he government is not prohibited
25   from introducing such evidence simply because the defendant is indicted for less than all of his
26   actions." Id. (internal quotations omitted). Here, the evidence is admissible under either
     category, because it shows the defendant using his official position to benefit the interests of
27   UESU, and because it shows the background and development of the conspiracy and allows the
28   jury to hear a "coherent and comprehensible story" about the commission of the crime.

UNITED STATES MOTION IN LIMINE
TO ADMIT COCONSPIRATOR STATEMENTS
[CR 00-0284-MJJ]                          13

1   35:23-36:8. After a brief meeting in which Kleshnya informed Tymoshenko that he could not

2   accept her prices, Kleshnya advised Lazarenko that he could not enter into an agreement with

3   UESU, and Lazarenko sharply reprimanded him. Id. at 36:13-28:22.

4       D. Summary of the Evidence of a Conspiracy

5          The foregoing evidence is clearly sufficient to demonstrate, by a preponderance of

6   evidence, that a conspiracy existed between Lazarenko and Tymoshenko to commit fraud and to

7   launder the proceeds of that fraud. Bourjaily, 483 U.S. at 175. The evidence set forth above, and

8   the reasonable inferences that it suggests, show that the defendant and Tymoshenko had an

9   agreement pursuant to which Lazarenko would and did use his official authority to benefit

10  Tymoshenko and her companies, and in exchange, the defendant received a portion of the profits

11  of her business. Tymoshenko set up a scheme of offshore companies that she used to funnel

12  money to Lazarenko that she received from the natural gas business. The use of nominal

13  directors who actually played no role in the business and knew nothing about the business was

14  designed to conceal the fact that Tymoshenko was the driving force behind these companies, and

15  that she controlled UESU, Somolli and UEIL. The network of offshore companies was designed

16  and used, at least in part, to take money earned from the sale of natural gas in Ukraine, pursuant

17  to contracts and official documents negotiated and signed by the defendant, and siphon that

18  money from UESU out of Ukraine to UEIL, then to Somolli, then to accounts controlled by

19  Kirichenko, and then on to Lazarenko during the year and a half that UESU was engaged in the

20  natural gas business. The defendant took official action ensuring that UESU received the right to

21  distribute the natural gas by signing official documents and he participated, in his official

22  capacity, in negotiations between RAO Gazprom and UESU that resulted in UESU getting a

23  contract with RAO Gazprom to distribute natural gas just one month after UESU was created.

24  The defendant and Tymoshenko would thereafter meet to discuss the money the defendant was

25  receiving from Tymoshenko and to take other action to ensure that the defendant remained in his

26  official position, so that Tymoshenko and the defendant could continue to benefit from the

27  defendant's largesse while a public official.

28

UNITED STATES MOTION IN LIMINE
TO ADMIT COCONSPIRATOR STATEMENTS
[CR 00-0284-MJJ]         14

1

## CONCLUSION

2      For the foregoing reasons and based on the record herein, the United States respectfully

3   moves to admit statements of Yulia Tymoshenko made in furtherance of the conspiracy and

4   scheme to defraud.

5

6   DATED: March 30, 2004                        Respectfully submitted,

7                                                KEVIN V. RYAN
                                                 United States Attorney
8

9

10                                               MARTHA BOERSCH
                                                 JONATHAN HOWDEN
11                                               PETER AXELROD
                                                 Assistant United States Attorneys
12
                                                 HALLIE MITCHELL
13                                               Trial Attorney, U.S. Department of Justice

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES MOTION IN LIMINE
TO ADMIT COCONSPIRATOR STATEMENTS
[CR 00-0284-MJJ]                            15

1                              CERTIFICATE OF SERVICE

2        The undersigned hereby certifies that she is an employee of the office of the United States

3    Attorney, Criminal Division, Northern District of California and is a person of such age and

4    discretion to be competent to serve papers. The undersigned further certifies that she caused

5    copies of the **SUPPLEMENTAL MOTION IN LIMINE TO ADMIT STATEMENTS**

6    **OF YULIA TYMOSHENKO AS CO-CONSPIRATOR STATEMENTS.**

7

8    United States of America v. Pavel Lazarenko, CR 00-0284 MJJ, to be served on the party(ies) in

9    this action, by placing a true copy thereof in a sealed envelope, addressed as follows which is the

10   last known address:

11

12   Riordan/Weinberg                          Daniel Horowitz
     523 Octavia Street                         120 Eleventh Street
13   San Francisco, CA 94102                    Oakland, CA 94612
     Fax: 415 552-2703                          Fax: 510 893-4451
14

15

16   ___ (By Personal Service), I caused such envelope to be delivered by hand to the person or
          offices of each addressee above.
17
     _X_ (By Facsimile), I caused each such document to be sent by Facsimile to the person or offices
18       of each addressee above.

19   ___ (By Mail), I caused each such envelope, with postage thereon fully prepaid, to be placed in
          the United States mail at San Francisco, California.
20
              I declare under penalty of perjury that the foregoing is true and correct.
21

22

23

24
     March 30, 2004                              Meg B
25                                                   Meg Beardsley
                                                     Paralegal
26

27

28